IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CALVIN CAVER,

        Plaintiff,

v.                                                  Civil Action No. 5:14cv164
                                                    (Judge Stamp)

KATHY P. LANE, Associate Warden,
FCI Hazelton; ERIC A. EARWIN, Deputy
Captain, FCI Hazelton; D. KOSCIANSKI,
Case Management Coordinator, FCI
Hazelton; and S. ROSENBERGER,
Unit Case Manager, FCI Hazelton,

        Defendants.

## REPORT AND RECOMMENDATION

On December 24, 2014, the *pro se* plaintiff, an inmate then-incarcerated at USP Hazelton[1] in Bruceton Mills, West Virginia, initiated this action by filing a <u>Bivens</u>[2] civil rights complaint against the above-named defendants; a motion to proceed as a pauper with supporting documents; and a motion for leave to file excess pages. By Order entered December 31, 2014, the plaintiff was granted permission to proceed as a pauper and directed to pay an initial partial filing fee ("IPFF"). On January 5, 2015, the plaintiff filed a Motion to Appoint Marshal to Serve Summons and Complaint. The plaintiff paid the IPFF on January 26, 2015.

On February 9, 2015, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time. Consequently, the defendants were directed to file an answer to the complaint and plaintiff's Motion to Appoint Marshal to Serve Summons and Complaint was denied as moot.

---

[1] Pursuant to a Notice of Change of Address filed by plaintiff on October 15, 2015, he is now incarcerated at FCI Schuylkill in Minersville, Pennsylvania. <u>See</u> Dkt.# 50.

[2] <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).

On April 14, 2015, the defendants moved for an extension of time and consolidated response date; by Order entered April 28, 2015, the motion was granted. On May 27, 2015, the defendants moved for another extension of time. By Order entered the same day, the motion was granted. On June 2, 2015, the defendant moved for a third extension of time; by Order entered June 3, 2015, it was granted. On June 17, 2015, plaintiff filed a certificate of service, evincing having served his First Request for Production of Documents on defendants.

On July 2, 2015, the defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. A Roseboro Notice issued on July 6, 2015, and an Order was entered, striking plaintiff's first request for production of documents as premature.

On July 13, 2015, the plaintiff filed three replies to the defendants' dispositive motion.

This case is before the undersigned for review, report and recommendation pursuant to LR PL P 2.

## I.  The Pleadings

**The Complaint**

In the complaint, plaintiff avers that he arrived at FCI Hazelton on June 4, 2014.[3]  On June 23, 2014, he was found in possession of 500 postage stamps.[4]  He asserts that this charge was later expunged.[5] However, he avers that initially, because of the charge, he was placed in the Special Housing Unit ("SHU") for about a week,[6] where he was subjected to many hardships. He contends that "at every available opportunity" he challenged SHU staff regarding these

---

[3] Dkt.# 9-1 at 2. See also Dkt.# 38-6 at 1.

[4] Dkt.# 9-2 at 2.

[5] Dkt.# 9-1 at 3.

[6] This appears to contradict the date on the Administrative Detention Order that plaintiff attached to his Memorandum in Support.  That July 14, 2014 Order states plaintiff was admitted to the SHU "[p]ending an SIS investigation." See Dkt.# 9-6 at 2 (emphasis added).

restrictions, and when released, he initiated the grievance process over these issues and requested return of the stamps that had been confiscated. When his request was denied, he filed a grievance.

Plaintiff alleges that on July 9, 2014, he was called to the lieutenant's office and advised that he could have the permissible amount of stamps returned to him but that a BOP Institutional Supplement forbade his being permitted to send home any other amount of stamps for which he could prove purchase [sic].[7] He returned to his unit and logged on to the Electronic Law Library ("ELL") to verify BOP policies on the issue. However, he was interrupted by four correctional officers ("C.O.s") who took him to the lieutenant's office, where he was strip searched and locked in a holding cell for "nearly three hours"[8] before being released. Before he was sent back to his unit, a Correctional Officer, T. Schneider ("Schneider"), gave him[9] a "small stack of papers" consisting of a legal pad, commissary sheets with his cellie's name on them, and a Fantasy Football player roster.[10] Once outside the lieutenant's office, plaintiff noticed that one of the papers stated "CONTRABAND FOUND and below it read: 98 stamps and gambling sheets."[11] Plaintiff immediately stopped a nearby Lt. Benson, and notified him that the papers Schneider had given him were not his, and showed Benson his cellie's name on the commissary sheets. Benson told plaintiff not to worry; plaintiff avers that although skeptical, he did not

---

[7] Dkt.# 9-2 at 3. Elsewhere, plaintiff says he was "called to the Correctional Services Department (i.e., Captain's office), and Lt. B. Benson gave him 60 postage stamps and stated he would not allow him to send home stamps he could [sic] establish ownership of." See Dkt.# 9-1 at 3.

[8] Dkt.# 9-2 at 4; see also Dkt.# 9-1 at 4. Elsewhere, plaintiff states he was held for "over an hour." See Dkt.# 9-5 at 3.

[9] Dkt.# 9-2 at 4.

[10] Dkt.# 9-2 at 4 and Dkt.# 9-5 at 4.

[11] Dkt.# 9-5 at 3.

anticipate receiving an Incident Report, so he went on his way.[12] Upon arrival back to his cell, his cellie L.F.[13] reported that while he was gone, the C.O.s, including Schneider, arrived to search plaintiff's belongings, assuring L.F. that "the search would only be with regard to . . .[plaintiff's] personal property."[14] L.F. advised the C.O.s which locker was plaintiff's and the search began; after the C.O.s left, L.F. noticed that they had confiscated some of L.F.'s own things as well.[15]

The following day, July 10, 2014, plaintiff was called to one Lt. Floyd's office to have an incident report read.[16] Also present was Lt. Benson. Plaintiff was advised that he had been written up for possessing excessive stamps and contraband gambling paraphernalia (i.e., the Fantasy Football roster).[17] Afterwards, plaintiff spoke with his cellie L.F. regarding T. Schneider's allegation that the gambling sheets were found inside plaintiff's locker, when they were actually found on top of L.F.'s locker.[18] L.F. advised plaintiff that he would notify the UDC that plaintiff was not responsible for the gambling sheets.[19]

Over the course of the next few weeks, plaintiff repeatedly asked to have his stamps returned to him. After speaking with "many lieutenants," finally, a Lt. Strickland advised him he

---

[12] Dkt.# 9-5, ¶2 - 3, at 3.

[13] Plaintiff's cellie is referred to herein by his initials to protect his privacy.

[14] Dkt.# 9-5 at 4.

[15] Dkt.# 9-1 at 4, 9-2 at 4, and 9-5 at 4.

[16] Dkt.# 9-5 at 4.

[17] Dkt.# 9-2 at 4.

[18] Dkt.# 9-2, ¶8 at 5.

[19] Dkt.# 9-2 at 5.

was not permitted to have the stamps returned to him.[20]  Plaintiff then researched BOP policy, determined that the BOP was required to return the stamps, and drafted an inmate request to defendant Earwin, requesting that he notify Lt. Strickland that he was allowed to have his stamps returned.[21]

On July 14, 2014, plaintiff attended a Unit Disciplinary Committee ("UDC") hearing on the July 9, 2014 incident report.  Afterwards, in the presence of defendant Rosenberger and one Desiree Young, Rosenberger advised him that he had "made enemies with some of the wrong people."[22]  Plaintiff avers that Rosenberger then "entered the . . . [BOP's] SENTRY database and fabricated Plaintiff's custody and security level calculation so that the database would suggest that Plaintiff had a negative prison adjustment [,] warranting an increase in his security level."[23]  Afterwards, Rosenberger "contacted the Correctional Services Dept [sic] requesting that Plaintiff be immediately removed from general population and . . . be placed in segregation . . . [because he was now] a High security inmate."  On July 24, 2014, plaintiff was transferred to USP Hazelton.[24]  He alleges that over the next several months, he lived in "constant fear" during  USP Hazelton's frequent lockdowns as a result of inmate-on-inmate violence.[25]

Accordingly, it appears that the Plaintiff's claims, implicitly and explicitly stated, are that his constitutional rights were violated because

---

[20] Dkt.# 9-2 at 3.

[21] Dkt.# 9-2 at 3.

[22] Dkt.# 9-1 at 5.

[23] Dkt.# 9-1 at 5.

[24] Dkt.# 9 at 8.  Per Defendant Steven Rosenberger's Declaration, attached to the defendants' response, plaintiff was transferred to USP Hazelton on July 23, 2014.  See Dkt.# 38-5, ¶5 at 2.

[25] Dkt.# 9-2 at 9.

1) the July 9, 2014 incident report regarding the postage stamps and gambling paraphernalia was falsified;

2) the defendants retaliated against him for filing grievances by intentionally and wrongfully falsifying his custody classification score to increase his security classification from medium to high security, resulting in his being transferred to USP Hazelton.

3) defendants' actions in placing him in FCI Hazelton's SHU and then transferring him to USP Hazelton resulted in his exposure to unpleasant and inconvenient conditions; and
4) defendants violated their own policy statements.

Plaintiff asserts that he has exhausted his administrative remedies and has attached copies

of the same to his memorandum in support.

As relief, the plaintiff requests a jury trial; "nominal damages" of $17,875.92 against

each defendant; compensatory damages of $76,894.73 against each defendant; punitive damages

of $214,981.23 against each defendant; costs and fees; and injunctive relief in the form of a

declaration that the defendants' acts violated his constitutional rights.

**Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment**

The defendants contend that the plaintiff's complaint should be dismissed or summary

judgment granted in their favor because plaintiff

1) fails to state a claim upon which relief can be granted;

2) fails to demonstrate the requisite level of personal involvement on the part of defendants Kathy Lane ("Lane"), Eric Earwin ("Earwin"), and D. Koscianski ("Koscianski") sufficient to sustain Bivens liability; and

3) even assuming *arguendo* that a claim has been stated, the defendants are all entitled to qualified immunity.

**Plaintiff's Reply**

Plaintiff's reply is comprised of three documents filed the same day, totaling 14 pages: a

Declaration in Opposition to Defendant's [sic] Summary Judgment Motion; Plaintiff's Statement

of Disputed Factual Issues; and Plaintiff's Memorandum in Opposition to Defendant's [sic]

Summary Judgment Motion.  In them, plaintiff reiterates his arguments and attempts to refute the defendants' on the same.

## II. <u>Standard of Review</u>

### A. <u>Motion to Dismiss</u>

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct.1955, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Id</u>.

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. <u>Id</u>.; <u>see</u> <u>also</u> <u>Nemet Chevrolet, Ltd. v. Comsumeraffairs.com</u>, Inc., 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." <u>Id</u>.

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed.R.Civ. P 8 (providing general rules of pleading), Fed.R.Civ. P. 9 (providing rules for pleading special matters), Fed.R.Civ. P. 10 (specifying pleading form), Fed.R.Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed.R.Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted.) <u>Francis v. Giacomelli</u>, 588 F.3d 186 (4th Cir. 2009).

*Pro se* plaintiffs are entitled to liberal construction of their pleadings. <u>Estelle v. Gamble</u>, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251(1976); <u>Haines v. Kerner</u>, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)(per curiam); <u>Loe v. Armistead</u>, 582 F.2d 1291 (4th Cir. 1978); <u>Gordon v. Leeke</u>, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, <u>Haines</u>, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. <u>Id</u>. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. <u>Barnett v. Hargett</u>, 174 F.3d 1128 (10th Cir. 1999). A court may not construct the plaintiff's legal arguments for her. <u>Small v. Endicott</u>, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." <u>Beaudett v. City of Hampton</u>, 775 F.2d 1274 (4th Cir. 1985).

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. <u>Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.</u>, 267 F.3d 30 (1st Cir. 2001)(cited with approval in <u>Witthohn v. Federal Ins. Co.</u>, 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. Specifically, a court may consider official public records,

"documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." <u>Katyle v. Penn Nat'l Gaming, Inc</u>., 637 F.3d 462 (4th Cir. 2011).

## B. <u>Motion for Summary Judgment</u>

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the  motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita</u>, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  <u>Id</u>. This means that the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' <u>Anderson</u>, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id</u>. at 248. Summary

judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

### III. Analysis

**A. Supervisory Liability**

In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the United States Supreme Court abolished supervisory liability under Bivens. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Iqbal, 556 U.S. at 676. "Because *vicarious liability* is inapplicable to Bivens and §1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. The Court held that "[i]n a §1983 suit or a Bivens action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." Ashcroft, 556 U.S. at 697. Moreover, the Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," and found that "purpose rather than knowledge" was required to impose liability. Id

**Kathy Lane, Associate Warden**

In the complaint, plaintiff alleges that Lane authorized his retaliatory transfer, knowing it was based on deliberate miscalculation of his custody and classification scoring. He contends that as the Associate Warden, she is legally responsible for supervising all institutional department heads. However, plaintiff does not make any specific allegation against Lane, regarding any act that would suggest personal involvement on her part. Instead, it appears that

Plaintiff has named her merely in her supervisory capacity as the associate warden of FCI Hazelton. Accordingly, Defendant Lane is due to be dismissed from this action.

## B. __Falsified Incident Report__

Plaintiff alleges that the officer who searched his belongings and confiscated the postage stamps and Fantasy Football roster was Correctional Officer T. Schneider. He alleges that Schneider "intentionally lied" in his report when he said that the Fantasy Football roster was found in plaintiff's locker along with the postage stamps, and that Schneider "cleverly wrote the report assuming that the committee would . . . decide that the report's body and attachments provide overwhelming evidence of guilt."[26]

The July 9, 2014 Incident Report, attached to plaintiff's memorandum in support, charging plaintiff with Prohibited Act Code(s) 305[27] and 326,[28] states in pertinent part:

> On 07-09-2014, at approximately 08:30 PM, I was conducting a random cell search in cell 228 in M-1 Unit. I was searching in the locker assigned to inmate Caver, Calvin . . . when I found 98 stamps and some gambling sheets in the locker concealed below some of his property. The stamps were located right along with the gambling sheets, and therefore, they were confiscated. Inmate Caver was taken to the Lieutenant's office where a visual search of his person was conducted. The search yielded 60 more stamps. Inmate Caver was given a copy of the confiscation form for the 98 stamps and the gambling sheets. He was given back 60 stamps, and was sent back to his unit. Signed *T. Schneider*

Dkt.# 9-3, §11 at 2.

In the "inmate comments" section of the report, plaintiff responded "[t]he gambling sheets were not his they were his cell mates [sic]. "The officer fabricated this report." [sic] He only had 66 stamps in his locker and not 98 stamps. He did have 60 stamps on his body when

---

[26] Dkt.# 9-5 at 4.

[27] Prohibited Act Code 305 is Possessing an Unauthorized Item. See 28 CFR 541.3.

[28] Prohibited Act Code 326 is for possession of gambling paraphernalia. See 28 CFR 541.3.

visually searched."[29]   The UDC's decision, based on specific evidence, was that plaintiff did commit the Prohibited Act 305, because plaintiff admitted having 66 stamps in his locker and 60 more stamps on his person,[30] but that the Prohibited Act Code 326 offense, possession of gambling paraphernalia, was unsupported because plaintiff's "cellmate accepted ownership."[31] Plaintiff was sanctioned with 90 days loss of Trulinks and phone, suspended, pending 180 days of clear conduct.[32]

Fatal for plaintiff's false incident report claim against Schneider, however, is that plaintiff has neglected to name Schneider as a defendant in this action; thus, no liability can be found against him. Nonetheless, even if Schneider *were* a named defendant and he *had* filed false disciplinary reports against plaintiff, the claim would be due to be dismissed anyway, because plaintiff does not have a constitutional right to be free from false disciplinary reports. "The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights." Lewis v. Viton, No. 07-3663, 2007 WL 2362587, at *9 (D. N.J. Aug. 14, 2007) (citing Freeman v. Rideout, 808 F.2d 949, 962-53 (2d Cir. 1986)). There simply is no constitutional right to be free from being falsely accused. See McClay v. Fowlkes, No. 1:07cv1080, 2008 WL 3992637, *4 n.6 (E.D. Va. Aug. 27, 2008) ("To the extent the plaintiff claims that he was falsely accused, he fails to state a §1983 claim because '[t]he prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a

---

[29] Dkt.# 9-3, §17 at 2.

[30] BOP Policy Statement BP 5265.14 addresses inmate correspondence, including postage stamps: §540.21(a)(3) Inmate Possession of Postage Stamps. The Warden issues local guidelines, limiting an inmate's possession of stamps at one time to no more than 60 (denomination for first-class, domestic, 1-ounce mailing), or the equivalent. The Warden may authorize possession of stamps to a specified amount in excess of this limit. The stamps are to be maintained by the inmate in the same manner the stamps are sold or in the manner provided by the unit manager.

[31] Dkt.# 9-3, §19 at 2.

[32] Dkt.# 9-3, §20 at 2.

protected liberty interest.") (internal citations omitted); <u>Anderson v. Green</u>, No. 082708, 2009 WL 2711885 *4 (D. Md. Aug. 24, 2009); <u>Riggerman v. Ziegler</u>, No. 5:11-0868, 2012 WL 4119674, *5 (S.D. W.Va. Aug. 22, 2012) (inmates have no constitutional right prohibiting false charges against them). Finally, even if C.O. Schneider did attempt to falsify a possession of gambling paraphernalia charge against plaintiff, it is apparent from the Incident Report that because plaintiff's cellie L.F. accepted ownership of the gambling paraphernalia, the charge against plaintiff for the same was dismissed as unfounded. Therefore, this claim should be dismissed as well, for failure to state a claim upon which relief can be granted.

## C. **Retaliation by Fabricating Custody Score**

Plaintiff asserts that defendant Rosenberger, with the help of defendants Lane, Earwin and Koscianski, fabricated and altered his custody score to punish him for submitting grievances and appealing disciplinary hearings, by altering his "Living Skills" and "Family/Community Ties" scores, to put him in a higher security classification, causing the transfer to USP Hazelton.[33] He contends that "absent[this] fabrication, his security level would not, under any other scenario, have been increased."[34]

Defendant Steven Rosenberger's Declaration, attached to the defendants' response, states that on June 19, 2014, approximately two weeks after his arrival at FCI Hazelton, plaintiff received an incident report for a violation of Code 305, Possessing an Unauthorized Item. Less than one month later, on July 9, 2014, he received a second incident report for the same offense. In both instances, plaintiff was found with an unusually large amount of postage stamps,

---

[33] Dkt.# 9-1 at 6, 9, 11 and 13.

[34] Dkt# 9-1 at 6.

indicating possible involvement in illegal gambling activities.[35] Accordingly, Rosenberger, as plaintiff's case manager, concluded that plaintiff's "adjustment to incarceration at FCI Hazelton . . . has been poor and he has become a management concern."[36] Rosenberger's sworn declaration denies falsifying plaintiff's custody classification, and further denies that plaintiff's "Living Skills" or "Community Ties" scores had any role in his transfer to USP Hazelton.[37] The defendants contend that plaintiff's transfer was based on legitimate, non-retaliatory grounds, because plaintiff had four incident reports in his history. In addition to the two Code 305 violations for Possessing an Unauthorized Item committed June 19 and July 9, 2014, respectively, he was found guilty of a Code 104, Possessing a Dangerous Weapon,[38] on March 9, 2009, and was found guilty of a Code 397 violation, Phone Abuse, on April 14, 2010.[39]

Claims of retaliation are treated with skepticism in the prison context because "every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." See Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); American Civil Liberties Union of Md. Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993); Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) (en banc) (citations omitted). A "plaintiff alleging that government officials retaliated against her in violation of her constitutional rights must demonstrate, *inter alia,* that she suffered some adversity in response to her exercise of protected rights. " American Civil Liberties Union of Maryland, Inc., *supra* at 785; see also

---

[35] See Dkt.# 38-5, ¶4 at 2.

[36] Request for Transfer/Application of Management Variable, Dkt.# 38-6 at 1.

[37] Dkt.# 38-5, ¶3 at 1.

[38] Plaintiff has attached a July 2, 2014 Request for Administrative Remedy to his Memorandum in Support, alleging that "my Skills Development Plan contains inaccurate disciplinary findings" and requesting that "Possession of a 'Dangerous Weapon' be replaced with 'Sharpened Instrument.'" Dkt.# 9-10.

[39] Dkt.# 38-6, §5 at 1.

<u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir.1994) (To prove a retaliation claim, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right."). A prisoner may state a claim of retaliatory transfer if the decision to transfer him was based on the inmate's exercise of a constitutionally protected right. <u>See</u> <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979); Therefore, *"in forma pauperis* plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B) ]." <u>Id</u>.

Here, plaintiff asserts that he was transferred a higher security institution in retaliation for filing administrative grievances and appealing them. However, an inmate does not have a constitutional right to participate in grievance procedures. <u>See</u> <u>Adams v. Rice</u>, *supra.* Therefore, plaintiff can state no retaliation claim based on his filing of administrative grievances. Further, an inmate does not have a constitutional right to be placed in a specific security classification." <u>Sandin v. Connor</u>, 515 U.S. 472 (1995).

Finally, even if plaintiff's claims had merit, plaintiff has failed to plead the requisite level of personal involvement in the interference with his custody classification on the parts of defendants Lane, Earwin and Koscianski. Instead, he merely makes conclusory *respondeat superior*-types of allegations against them, alleging that while in the SHU, he submitted written requests to Lane and Earwin regarding the issue, but they did nothing to intervene.[40] Likewise, he alleges that even after he explained his "fabrication" concerns to defendant Koscianski, Koscianski also failed to intervene.[41] Even if true, these allegations do not state sufficient personal involvement for the imposition of <u>*Bivens*</u> liability, because denying an inmate's

---

[40] Dkt.# 9-1, ¶16 at 6.

[41] Dkt.# 9-1, ¶17 at 7.

grievances is not the type of personal involvement required to state a <u>Bivens</u> claim. <u>See</u> <u>Fellove v. Heady</u>, 2008 WL 196420, at *4 (N.D. W.Va. Jan. 22, 2008) (stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state a <u>Bivens</u> claim"); <u>Paige v. Kupec</u>, 2003 WL 23274357, at *1 (D. Md. Mar. 31, 2003), *aff'd,* 70 Fed. Appx. 147 (4th Cir. 2003) (finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy).

Accordingly, Plaintiff's retaliatory transfer claim against defendants Rosenberger, Lane, Earwin and Koscianski must be dismissed with prejudice for failing to state a claim upon which relief can be granted.

**D. <u>Defendants' Failure to Adhere to their own Policy Statements</u>**

To the extent that the plaintiff may be alleging that unspecified officials at FCI Hazelton violated policy statements and operating procedures by failing to return his excess postage stamps to him, or by placing him in the SHU, he again fails to state a due process claim. A <u>Bivens</u> action "must be founded upon a violation of constitutional rights," <u>Arcoren v. Peters</u>, 829 F.2d 671, 676 (8th Cir. 1987), and "a failure to adhere to administrative regulations does not equate to a constitutional violation." <u>Hovater v. Robinson</u>, 1 F.3d 1963, 1068 n. 4 (10th Cir. 1993) (citing <u>Davis v. Scherer</u>, 468 U.S. 183, 194 (1984)); <u>Petway v. Lappin</u>, No. 5:06-cv-135, 2008 WL 629998, at *5–6 (N.D. W.Va. Mar. 5, 2008) (allegation that prison officials violated policy statements and operating procedures in holding inmate in administrative segregation did not state a due process claim). Accordingly, this claim should be dismissed for failure to state a claim upon which relief can be granted.

## E. Plaintiff's Placement Within the BOP System is Discretionary

Plaintiff alleges that defendant Rosenberger ordered his July, 2014 placement in the SHU,[42] and his subsequent "retaliatory" transfer to USP Hazelton.[43]

The Code of Federal Regulations provides several instances, including holdover status, transfer, and post-disciplinary detention, when a prisoner may be placed in administrative detention status. 28 C.F.R. §541.23. An inmate may be placed in administrative detention when his "presence in the general population poses a threat to life, property, self, staff, other inmates, the public, or to the security or orderly running of the institution." Id. Further, an inmate who is "under investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law" may be confined in administrative detention. Id. Additionally, the United States Code reads, "[t]he Bureau [of Prisons] may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another." 18 U.S.C.A. §3621(b). Maximum custody is the highest custody level to which an inmate can be assigned. This classification is for individuals who, by their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution. See P.S. 5100.08, Chapter 2, p. 3. Pursuant to BOP policy, each inmate's custody classification is reviewed annually, with the inmate's unit team and/or Warden being the final review authority. See P.S. 5100.08, Chapter 6, pp. 12. The intent of the Custody Classification System is to permit staff to use professional judgment within specific guidelines. Wagoner v. O'Brien, 2012 WL 2924027 *5 (N.D. W.Va. 2012).

To establish a due process violation with regard to restrictions imposed in the course of his imprisonment, plaintiff must prove "atypical and significant hardship . . . in relation to the

---

[42] Dkt.# 9-1, ¶15 at 5.

[43] Dkt.# 9-1, ¶15 at 5.

ordinary incidents of prison life." <u>Sandin v. Conner</u>, 515 U.S. 472, 483–84 (1995). An inmate has no liberty interest in avoiding confinement in administrative segregation. <u>Beverati v. Smith</u>, 120 F.3d 500 (4th Cir. 1997).

Plaintiff's first stint in the SHU, beginning from approximately June 23, 2014 and lasting for about a week, was incident to the discovery and investigation of his possession of 500 postage stamps and thus was authorized, pursuant to 28 C.F.R. §541.23(c)(1). His second stay there, from July 14 – 24, 2014, was likewise pending SIS investigation, and authorized under 28 C.F.R. §541.23(c)(1). Plaintiff has made no showing that his placements in the SHU were either a condition which exceeded his sentence in an unexpected manner or which created an atypical or significant hardship in relation to the ordinary incidents of prison life. <u>See</u> <u>Redman v. Kilgore</u>, No. 5:08-0081, 2011 WL 830060, at * 4 (S.D. W.Va. Jan. 14, 2011). Because plaintiff does not have a constitutional right to be free from administrative detention in the SHU, he has failed to state a claim upon which relief can be granted.

As for plaintiff's claim that he was wrongfully transferred to USP Hazelton, the defendants contend that plaintiff's custody classification change was warranted, because of his own actions in incurring four disciplinary violations, two of which were for the same offense, committed within less than a month of each other, within the first two months of plaintiff's arrival at FCI Hazelton. Defendants agree that plaintiff's first Incident Report regarding the 500 postage stamps was later expunged.[44] Nonetheless, they contend that at the time of the July 18, 2014 transfer request,[45] that Incident Report had not yet been expunged; thus, Case Manager Rosenberger's reference to it was proper at the time. However, even so, Rosenberger's transfer

---

[44] Dkt.# 38, FN3 at 8.

[45] Dkt.# 38-6.

request recommendation required the approval of the staff at the Designation and Sentence Computation Center ("DSCC"). After an inmate's initial designation is completed by the DSCC, the inmate's custody classification is normally reviewed by their unit team at a regularly-scheduled 12-month program review. However, changes that could increase or decrease an inmate's overall security level assignment, such as incident reports, a new sentence, or a sentence reduction, should be scored outside of the 12-month cycle.[46] The DSCC makes the final decision as to whether an inmate is transferred, and only the DSCC Administrator can approve and authorize a transfer.[47]

Defendants contend that as an inmate serving a life sentence, a Public Safety Factor ("PSF")[48] of "sentence length" applies to plaintiff,[49] as it does to all male inmates with more than 30 years yet to serve, including non-parolable life sentences, mandating that they be housed in a high security level institution, unless waived.[50] The only reason plaintiff was not already initially housed in a maximum security facility was because the DSCC had given him a "Management Variable"[51] of "lesser security," finding that a medium security facility was sufficient at that time.[52] Plaintiff's Management Variable has since expired. Institution staff may recommend an

---

[46] See Dkt.# 38-1, ¶5 at 2, and BOP Program Statement 5100.08, Ch.6, p. 1.

[47] See Dkt.# 38-1, ¶6 at 7 – 8 and BOP Program Statement 5100.08, Ch. 5, p. 1.

[48] A PSF is relevant factual information regarding the inmate's current offense, sentence, criminal history or institutional behavior that requires additional security measures be employed to ensure the safety and protection of the public. See Dkt.# 38-1, ¶4 at 2 and BOP Program Statement 5100.08, Chapter 5, p.8.

[49] See Calvin Caver BOP Security/Designation Data, Dkt.# 38-3 at 1.

[50] See Dkt.# 38 at 10 and BOP Program Statement 5100.08, Ch. 5 at 9.

[51] A MGTV reflects and supports the professional judgment of Bureau staff to ensure the inmate's placement in the most appropriate level institution. A MGTV is required when placement has been made and/or maintained at an institution level inconsistent with the inmate's security score -- a score which may not completely or accurately reflect his security needs. See Dkt.# 38-1, ¶4 at 2 and BOP Program Statement 5100.08, Chapter 2, p. 4.

[52] See Calvin Caver BOP Security/Designation Data, Dkt.# 38-3 at 1.

inmate for a Management Variable, but it, like a transfer, must be approved by the DSCC. No new Management Variable has been recommended for plaintiff by facility staff, and thus, that lack of one on his most recent Male Custody Classification Form;[53] the Incident Reports incurred; and the July 10, 2014 Request for Transfer, made it more likely that the DSCC would approve defendant Rosenberger's July 18, 2014 request for plaintiff's transfer to a high security facility. Plaintiff's ultimate transfer to USP Hazelton was done in accordance with 18 U.S.C.A. §3621(b).

Plaintiff's BOP placement decisions were done according to the letter of the law and were entirely within the BOP's discretion. At no point do they raise any constitutional concerns, nor do they present grounds for any relief to the plaintiff. Moreover, it is apparent from the docket that the plaintiff has recently been transferred out of USP Hazelton to a different medium security institution, thus, he is no longer subjected to the hardships inherent in incarceration in a maximum security institution. Even if he had not been so transferred, these claims fail to state a claim upon which relief can be granted.

**F. Conditions of Confinement**

In general, the Eighth Amendment prohibits "cruel and unusual punishment." Farmer v. Brennan, 511 U.S. 825 (1994). In order to comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

---

[53] See December 17, 2014 Male Custody Classification Form, Dkt.# 38-4.

substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. at 837.

It must be remembered that "the Constitution does not mandate comfortable prisons" and prisons "cannot be free of discomfort." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981). Therefore, a deprivation of a basic human need is "only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991).

To act with a "sufficiently culpable state of mind," a prison official must not only know of the facts leading to the deprivation, but also know that deprivation would expose an inmate to a certain danger. <u>See</u> <u>Oliver v. Powell</u>, 250 F. Supp. 2d 593, 604 (E.D. Va. 2002); <u>See</u> <u>also</u>, <u>DeBlasio v. Johnson</u>, 128 F. Supp. 2d 315, 325 (E.D. Va. 2000). A constitutional violation can be shown if a prison official shows deliberate indifference to the inmate's health or safety. <u>Farmer v. Brennan</u>, *supra* at 828.

Conditions of confinement for those who have been convicted of crimes are evaluated under the Eighth Amendment. The United States Supreme Court set forth the general framework under which such claims are to be decided in <u>Rhodes v. Chapman</u>, 452 U.S. 337 (1981). "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." <u>Id.</u> at 347. Accordingly, under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." <u>Wolfish v. Levi</u>, 753 F.2d 118, 125 (2nd Cir. 1978), *rev'd on other grounds*, <u>Bell v. Wolfish</u>, 441 U.S. 520 (1994) (Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate

food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), *quoting* Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

Here, plaintiff contends that during his confinement in the SHU at FCI Hazelton, he was denied recreation; visits to the law library; footwear; cleaning supplies; writing materials; and the opportunity to visit the commissary to purchase writing materials, postage stamps and/or over-the-counter ("OTC") medications. Further, he alleges that while "wrongfully" incarcerated in USP Hazelton, he was prevented from purchasing stamps and writing materials; his visitation was curtailed; law library and court access was impeded; lack of employment opportunities; restricted participation in re-entry and self-help programs; and limited access to educational, medical and recreational departments.

A liberal reading of the plaintiff's complaint indicates that he is alleging that his involuntary confinement in the SHU violated his Eight Amendment right to be free of cruel and unusual punishment as well as his right to due process. However, the record establishes otherwise.

### 1) Lack of Access to Amenities

Plaintiff alleges that while confined to FCI Hazelton's SHU, he was denied footwear; cleaning supplies; writing materials; and the opportunity to visit the commissary to purchase more writing materials, postage stamps and over-the-counter ("OTC") medications.

Plaintiff alleges that he was admitted to FCI Hazelton's SHU on June 23, 2014 and remained there for about a week.[54] Subsequent to the July 14, 2014 UDC hearing, the FCI Hazelton's Administrative Detention Order indicates that plaintiff was readmitted to the SHU on

---

[54] Dkt.# 9-2 at 2 and 9-1 at 3.

July 14, 2014[55] and remained there until he was transferred to USP Hazelton on July 23, 2014.[56] As such, he was only confined in FCI Hazelton's SHU for a total of approximately seventeen days. Not only has plaintiff failed to allege any harm as a result of these deprivations, these claims hardly rise to the level of an Eighth Amendment violation. See Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997)(holding that administrative segregation for six months with vermin, human waste, flooded toilet, unbearable heat, cold food, dirty clothing, no outside recreation, and no education was not so atypical as to impose a significant hardship).

**2) Lack of Access to Recreation**

Plaintiff contends that while housed in FCI's SHU and while at USP Hazelton in lockdown, his access to recreation was restricted.

With regard to lack of recreation, an inmate must show specific harm resulting from the deprivation and a complete denial for an extended period of time. *Compare* Mitchell v. Rice, 954 F.2d 187, 192 (4th Cir. 1992)(seven months without out-of-cell exercise violated constitutional standards of decency), and Knight v. Armontrout, 878 F.2d 1093, 10-95-96 (8th Cir. 1989)(thirteen days without recreation does not rise to Eighth Amendment violation).

Here, plaintiff has not alleged how long he was denied recreation. Nor has he alleged, let alone proven, that he suffered any harm from restricted access to recreation. This claim should be dismissed.

**3) Lack of Employment Opportunities**

Plaintiff contends that while at USP Hazelton, his rights were violated by the lack of employment opportunities.

---

[55] Dkt.# 9-6 at 2.

[56] Dkt.# 38-5, ¶5 at 2.

This allegation does not rise to the level of a constitutional violation. As this Court has recognized, the law is well established that a prisoner does not have a constitutionally protected right to work while incarcerated – or to remain in a particular job once assigned. Boyles v. W. Va. Dep't of Corrections, No. 5:12cv182, 2013 WL 5728143, at *2 (N.D. W.Va. Oct. 22, 2013.). "Prisoner work assignments are matters within the discretion of prison officials, and denial of employment does not, in and of itself, abridge any constitutional right of the inmate. Id. (*citing* Johnson v. Krable, No. 88-7729, 1988 WL 119136, at *1 (4th Cir. 1988).

**4) Lack of Rehabilitative Opportunities**

Plaintiff contends that while "wrongfully" incarcerated in USP Hazelton, his participation in re-entry and self-help programs was restricted and he had limited access to educational, medical and recreational departments

Title 18 U.S.C. §4081 gives prison officials full discretion to determine prisoner classification and eligibility for rehabilitative programs in the federal system. Moreover, an inmate has no constitutional entitlement to rehabilitative programs, and the denial of access to them does not rise to the level of a due process violation. Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976). Therefore, the fact that the plaintiff cannot access certain rehabilitative programs that are exclusive to FCI facilities does not constitute a due process violation. Wagoner v. O'Brien, *supra* at *5.

**5) Access to the Law Library and to the Courts**

Plaintiff contends that while in the SHU at FCI Hazelton, he had no law library access.[57] However, elsewhere, he contradicts this claim, saying that "[w]hile in the special housing unit, Plaintiff had the opportunity to visit the law library."[58]

---

[57] Dkt.# 2-2 at 2.

The mere inability of a prisoner to access the law library is not, in itself, an unconstitutional impediment. The inmate must show that this inability caused an actual harm, or in other words, unconstitutionally prevented him from exercising that fundamental right of access to the courts in order to attack his sentence or to challenge the conditions of his confinement. Lewis v. Casey, 518 U.S. 343, 355 (1996), quoted in Akins v. United States, 204 F.3d 1086 (11th Cir. 2000). Here, plaintiff has not even attempted to make this requisite showing for the brief time periods from June 23, 2014 for about a week, and again from July 14, 2014 until July 24, 2014, when he was transferred out of FCI Hazelton to USP Hazelton, thus, his claim in this regard must be dismissed.

Plaintiff also alleges that while at USP Hazelton, his access to the law library and presumably therefore to the courts was restricted.

 "The fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries, or adequate assistance from prisoners trained in the law." Bounds v. Smith, 430 U.S. 817, 828 (1977). When alleging denial of access to the courts, a prisoner must make specific allegations and must also identify an actual injury resulting from official conduct. Cochran v. Morris, 72 F.3d 1310 (4th Cir. 1996). "A showing of injury is required in order to avoid adjudication of trivial claims of deprivation." Id. at 1317. Actual injury sufficient to sustain a cause of action for denial of access to the courts is present where, for example, an inmate deprived of legal materials is unable to meet court imposed deadlines as a result of the deprivation. Roman v. Jeffes, 904 F.2d 192, 198 (3rd Cir. 1990).

---

58 Dkt.# 2-1 at 5.

However, "the injury requirement is not satisfied by just any type of frustrated legal claim. Nearly all of the access-to-courts cases in the <u>Bounds</u> line involved attempts by inmates to pursue direct appeals from the convictions for which they were incarcerated, or habeas petitions. In <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974), we extended this universe of relevant claims only slightly, to 'civil rights actions' -- i.e., actions under 42 U.S.C. §1983 to vindicate 'basic constitutional rights.'" <u>Lewis v. Casey</u>, 518 U.S. 343, 354 (1996)(citations omitted).

In the instant case, without offering any detail or alleging an actual injury, the plaintiff makes a conclusory allegation that his right of access to the law library and to the courts was restricted, presumably from July 24, 2014 – until approximately October 10, 2015,[59] the time he spent at USP Hazelton. Not only is this claim insufficiently pled, it is apparent from the docket of the instant case that the plaintiff filed the pleadings and documents to initiate this case on December 24, 2014; on December 31, 2014, he filed his memorandum in support; and on July 13, 2015, he filed his three replies to the defendants' dispositive motion. Further, a review of PACER indicates that on September 29, 2014, he filed a Motion to Correct Presentence Investigation Report in the Northern District of Ohio sentencing court;[60] and on October 20, 2014, a Motion for Reconsideration Pursuant to Rule 59(e) and Request for Expedited Disposition, challenging the denial of another motion. On November 21, 2014, he filed a Notice of Appeal to the Sixth Circuit Court of Appeals of the Order denying his Motion for Reconsideration Pursuant to Rule 59(e). In the Sixth Circuit Court of Appeals,[61] on December 22, 2014, he filed a *pro se* Appellant's Brief; on January 2, 2015, a motion to proceed as a

---

[59] Plaintiff's Notice of Change of Address, indicating he had been transferred from USP Hazelton to FCI Schuylkill, docketed on October 15, 2015, is dated October 10, 2015. <u>See</u> Dkt.# 50.

[60] N.D. Ohio Case No. 1:03cr486-4.

[61] 6th Cir. Case No.14-4182.

pauper; two motions to extend the time in which to file reply briefs on March 18, 2015 and April 2, 2015. Although both of those motions for extensions of time do reference the lockdowns at USP Hazelton as a reason for needing more time,[62] the extensions were granted each time. Even assuming that plaintiff's confinement in USP Hazelton's lockdown did cause an actual injury, plaintiff still has the burden of showing that the lockdown was not "'reasonably related to legitimate penological interests,'" in order for the lockdown to be considered an unconstitutional impediment. Turner v. Safley, 482 U.S. 78, 89 (1987); see also Harris v. I.K. Ostrout Co., 65 F.3d 912, 916 (11th Cir. 1995) (holding that a prisoner challenging a prison security regulation must rebut the presumption of reasonableness attached to that regulation). Akins v. United States, 204 F.3d 1086 (11th Cir. 2000). However, plaintiff filed his reply brief in the 6th Circuit Court of Appeals on April 6, 2015, and on July 15, 2015, he prevailed: the 6th Circuit vacated and remanded.[63] Clearly, plaintiff cannot show the prejudice resulting from the temporary denials of access to the courts sufficient to establish a constitutional violation. Accordingly, plaintiff's claims regarding denial of access to the law library and courts while at USP Hazelton are belied by his filings in this court, in the Northern District of Ohio, and in the Sixth Circuit Court of Appeals, and he fails to state a claim for relief.

## 6) Exposure to More Violent Prisoners at a Maximum Security Institution

Plaintiff alleges that he was forced to live in "constant fear" at USP Hazelton, because of all of the violence that resulted in frequent facility lockdowns.

Considered in the light most favorable to the plaintiff, given that he alleges no injury or harm as a result of his alleged exposure to more dangerous inmates, his claim is insufficient to give rise to a genuine issue of fact as to whether a claim of a constitutional magnitude has been

---

[62] (6th Cir. Dkt.# 12 and 14)(14-4182).

[63] (6th Cir. Dkt.# 17)(14-4182).

presented. As regrettable and unfortunate as it might be to be confined with violent criminals, such confinement does not, by itself, rise to the level of a constitutional violation. "Being around dangerous individuals is simply part of life, something with which every inmate must contend. Therefore, the fact that Petitioner has been forced to live around dangerous individuals does not constitute a due process violation." Wagoner v. O'Brien, *supra* at *5.

## G. Three Strikes Rule

Finally, plaintiff is warned that pursuant to 28 U.S.C. §1915(g) he will not be granted *in forma pauperis* status in the future, if he has "on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." Assuming that this Report and Recommendation is adopted by the District Judge, the instant case will be the first filed by plaintiff in this district that has been dismissed for failure to state a claim upon which relief can be granted.

## IV. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Dkt.# 37) be **GRANTED** and plaintiff's complaint against the defendants (Dkt.# 1) be **DENIED** and **DISMISSED with prejudice** pursuant to 28 U.S.C. §§1915A and 1915(e) for the failure to state a claim.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by December 1, 2015**, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the

basis for such objections.  A copy of any objections shall also be submitted to the United States District Judge.  **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**.  28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985);  United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied,* 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff, via certified mail, return receipt requested, and electronically to all counsel of record.

DATED: November 17, 2015


 /s/  James E. Seibert_____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE